No. 65,463

STATE ·OF KANSAS, *Appellee,* v. CLAYTON P. PELTIER, *Appellant.*

(819 P.2d 628)

Opin-
ion filed October 25, 1991.

*Lucille Marino,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*Jeffrey E. Goering,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a direct appeal by the defendant from convictions of aggravated kidnapping, K.S.A. 21-3421; indecent liberties with a child, K.S.A. 1990 Supp. 21-3503; and sexual

exploitation of a child, K.S.A. 1990 Supp. 21-3516(1)(b). The defendant contends the district court erred in instructing the jury as to aggravated kidnapping and that the evidence was insufficient to support the convictions of aggravated kidnapping and sexual exploitation of a child.

Shortly before 6:30 p.m. on October 23, 1989, seven-year-old K.T. left home to "see some puppies down the street." She took her dog, Rusty, with her. About 10 minutes later, Rusty returned alone. The police were called and arrived about 7:00 p.m. For the next 24 hours, the police, with many volunteers, looked for K.T.

On October 24, 1989, Officer Fortune, of the Wichita Police Department, was involved in the search for K.T. At approximately 6:30 p.m., he noticed her walking toward her house from the alley. When he questioned her, K.T. told Fortune that she had been with a man called "Clay" or "Blue" close to her home. Assuming she had been driven to the area and left by someone, Fortune asked what color car the individual had. K.T. told him the man had a blue car. Fortune then ran towards the alley to ask if anyone had heard or seen anything. A neighbor told him that he had heard a door slam to the north. Fortune heard a car start to the north in the alley. When he ran into the alley, he saw a blue car backing out. He yelled, "Police. Hold on." The second time he yelled, the vehicle stopped, and the driver got out.

The individual driving the car produced an Indian reservation identification card with the name Clayton Peltier. Fortune recalled that K.T. had given the name "Clay," which he suspected was a variation of the name Clayton. Peltier claimed he had been looking for a job all day. Because Peltier was acting "too nervous," Fortune placed him in handcuffs.

Although K.T. was normally a talkative child, her mother testified that when K.T. first returned home she was very quiet and hesitant. K.T. told her mother and the police that Clay said he would kill her mother if K.T. said anything. After being assured that nothing would happen to her mother, K.T. told her mother and the police that she had been in a house in the alley with a man she called Clay and Blue. K.T. told them he had taken pictures of her but did not mention that he had touched her.

She also described tattoo marks on the person's hands and body. One of the officers went into the alley where Fortune was holding defendant. When the officer saw similar tattoo marks on defendant's hands, defendant was taken into custody as a suspect.

K.T. testified at trial that when she left her house she went to the alley. There she spoke to Clay, who offered her some dog food for her dog. She told him she would wait outside, but he led her inside and told her to watch television while he got the dog food. Clay got something from a box. Then he sat with K.T. on the couch and watched television. During this time she sat on his lap, and he rubbed her "private" underneath her dress and panties.

He later took her to a bed and got on top of her, telling her she could go home after taking a nap. Her testimony was conflicting as to whether Clay was wearing any clothes when he touched his "private" to her "private." Neither of them said anything and, when he got off her, she said that she wanted her mother. He told her that if she did not quit crying and asking for her mother, he would not let her go. At one point, Clay kissed K.T., putting his tongue in her mouth, and told her he was doing it so she would know how when she grew up. She stated he did not touch her while he kissed her.

While in the bedroom, Clay put different pairs of his girlfriends' panties on K.T. He licked her "private" with his tongue and took pictures of K.T. in her dress and in his girlfriends' underwear, but K.T. did not see the pictures. He then let her go home.

K.T. testified that, during her stay at defendant's house, she heard knocking at the door three times. Each time he told her to be quiet, one time tying a white cloth over her mouth. She did not sleep at all, but he slept some of the time.

K.T. testified that before letting her go, defendant told her that if she came back and saw him every day after school, he would give her $100 but that he would kill her mother if K.T. told anyone the truth.

Following his arrest, a search was conducted of defendant's house. Four pairs of women's panties were retrieved, as well as a camera bag with a 35 millimeter camera containing a roll of film with 23 exposures. A police officer unloaded the undeveloped film from the camera and gave it to a laboratory technician, who

developed the negatives. These negatives were later printed into photographs. Eleven of these photographs were introduced at trial.

The parties stipulated that the photographs of K.T. were taken in defendant's bedroom and were developed from film that was removed from a camera found in defendant's house. Defendant testified that he recognized K.T. and that he had never touched or fondled her.

The defendant first challenges the sufficiency of the evidence to support the element of bodily harm needed for aggravated kidnapping. This was the major issue argued in the district court and in this appeal. On appeal, the standard in considering the sufficiency of the evidence is whether after a review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979); *State v. Graham*, 247 Kan. 388, 398, 799 P.2d 1003 (1990).

Defendant argues that the State failed to establish beyond a reasonable doubt that bodily harm was inflicted upon K.T. Defendant recognizes that permanent injury is not necessary to establish the infliction of bodily harm but argues that some act of physical force, committed in "an intentional, hostile and aggravated manner" is necessary. *State v. Sanders*, 225 Kan. 156, 158-59, 587 P.2d 906 (1978). Thus, to elevate a simple kidnapping to a class A felony of aggravated kidnapping, which requires a life sentence, defendant asserts that some bodily harm must be inflicted. Defendant urges this court to reject the State's "extreme position that [in] any case in which a child is fondled, bodily harm has been established." The defendant points out that if the legislature had intended the penalty for indecent liberties with a child to be a class A felony, it would have made it one, instead of a class C felony. Therefore, defendant argues that not every indecent liberties offense committed in connection with a simple kidnapping should automatically sustain an increased charge of aggravated kidnapping.

This court has consistently held that rape as a matter of law constitutes bodily harm sufficient to support an aggravated kidnapping conviction. *State v. Brown*, 181 Kan. 375, 312 P.2d 832

(1957). In analyzing the history behind aggravated kidnapping, the court in *Brown* pointed out that the statute in effect grew out of the Lindbergh kidnapping case, where ransom was the motive and the victim was taken from one state to another. 181 Kan. at 385. The court concluded that the Kansas statute denounced two acts of kidnapping in the first degree: (1) kidnapping with the intent to exact ransom or reward, and (2) kidnapping if bodily harm is inflicted upon the person kidnapped. 181 Kan. at 388. The court then turned to consider the definition of "bodily harm" required to establish kidnapping. The court examined recent decisions by the California courts that generally defined bodily harm to include any touching of the person of another " 'against his will with physical force in an intentional, hostile and aggravated manner, or projecting of such force against' " that person. *Brown*, 181 Kan. at 389 (quoting *People v. Tanner*, 3 Cal. 2d 279, 44 P.2d 324 [1935]). Thus, a forcible rape constituted bodily harm sufficient to sustain a conviction of aggravated kidnapping and the accompanying death penalty. 181 Kan. at 389 (citing *People v. Brown*, 29 Cal. 2d 555, 176 P.2d 929 [1947]).

Once again following California decisions, this court in *State v. Taylor*, 217 Kan. 706, 714, 538 P.2d 1375 (1975), refined the definition of "bodily harm" by recognizing that some "trivial" injuries are likely to result from any forcible kidnapping by the very nature of the act. Insignificant bruises or impressions resulting from the act of kidnapping were not the type of "bodily harm" the legislature intended to subject to a more severe penalty. This court noted: "A significant policy reason for making the distinction is to deter a kidnapper from inflicting harm upon his victim, and to encourage the victim's release unharmed." 217 Kan. at 714. This court approved the California court's view that the legislature sought to deter "only unnecessary acts of violence upon the victim, and those occurring after the initial abduction." by enacting the aggravated kidnapping statute. 217 Kan. at 714. This refinement of the meaning of "bodily harm" fit prior discussions on the issue because the rapes in the earlier cases were acts of violence unnecessary to and not part of the kidnapping itself. Although the bodily harm or injury may have been temporary in these cases, at least some occurred. 217 Kan. at 714.

In *Taylor*, the defendant threw a seven-year-old girl, who did not know how to swim, into a rain-swollen river. Because the girl suffered no permanent injury from her ordeal, the court concluded that, for the kidnapping to be aggravated, throwing her into the river must be "bodily harm" as a matter of law. 217 Kan. at 714-15. Bodily harm was previously defined in *Brown* to include "any touching of a victim against [the victim's] will, with physical force, in an intentional, hostile and aggravated manner, or the projecting of such force against the victim by the kidnapper." *Brown*, 181 Kan. at 389. The *Taylor* court concluded that throwing the girl into the river was an act of physical force committed in "an intentional, hostile and aggravated manner," that was unnecessary and outside the required scope of forcible kidnapping. The aggravated kidnapping statute was designed to deter this type of attack. The river was swollen and fast, the girl could not swim, and she was wearing a heavy corduroy coat. Throwing the girl into the river constituted the bodily harm needed to support aggravated kidnapping. *Taylor*, 217 Kan. at 714-15.

This court extended the concept that rape constitutes the "bodily harm" necessary for aggravated kidnapping as a matter of law to include acts of sodomy. In *State v. Chears*, 231 Kan. 161, 164, 643 P.2d 154 (1982), the trial court instructed the jury that the crime of sodomy, as set forth in the instructions, constituted bodily harm. This court once again relied upon a California Supreme Court case, which held that forcing a female victim to commit sodomy constituted the infliction of bodily harm within the meaning of the California kidnapping statute. *People v. Chessman*, 38 Cal. 2d 166, 185, 238 P.2d 1001 (1951), *cert. denied* 343 U.S. 915, *reh. denied* 343 U.S. 937 (1952). Following the decision in *Chessman*, this court held that forcing a victim to commit sodomy constitutes the infliction of bodily harm as that term is used in the aggravated kidnapping statute, K.S.A. 21-3421.

The State argues that the decision in *State v. Bourne*, 233 Kan. 166, 660 P.2d 565 (1983), supports its argument by holding that indecent liberties supplied the bodily harm to make the kidnapping charged in that case aggravated. In *Bourne*, the defendant argued that moving two girls individually to a separate bedroom

to commit rape and indecent liberties, respectively, did not constitute movement needed to prove aggravated kidnapping under *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976). This court found moving each girl into another room, away from her parents, brother, and defendant's accomplice, was sufficient movement to constitute kidnapping because none of the others could see or interfere with defendant's acts. The court then stated: "The rape and the indecent liberties supplied the bodily harm to make the kidnapping aggravated." *Bourne*, 233 Kan. at 168.

*Bourne* did not involve the sufficiency of evidence to support bodily harm for aggravated kidnapping but, instead, concerned the adequacy of the confinement sufficient to comply with *Buggs*. Only in deciding that the movement was sufficient did the court, in dicta, note that *rape and* indecent liberties supported the bodily harm needed to establish the aggravated nature of the kidnapping.

In the instant case, the district court did not consider, and neither party discussed, the decision in *State v. Royal*, 234 Kan. 218, 670 P.2d 1337 (1983). In *Royal*, the victim was approached by a man in the parking lot of her apartment complex. He suddenly grabbed her around the neck and held a knife to her throat. She fought off the man, and he eventually gave up. During the fight, she suffered a small knife gouge on her collarbone and a small cut on her hand, both from the knife the assailant was carrying. Also, she was knocked out and received a bad bruise and a scraped knee. 234 Kan. at 220. Defendant was charged with and convicted of aggravated kidnapping. The trial court refused defendant's request to instruct on kidnapping as a lesser included offense. Defendant argued that the kidnapping became aggravated only when bodily harm was inflicted upon the person and that the victim, although sustaining injuries, did not receive injuries that constituted bodily harm sufficient to support a conviction of aggravated kidnapping as a matter of law.

In considering this issue, this court reviewed its prior discussions of bodily harm in *Taylor*, 217 Kan. 706, as well as in *State v. Sanders*, 225 Kan. at 158-59. The court noted that *Taylor* defined bodily harm as "any touching of the victim against the victim's will, with physical force, in an intentional, hostile and aggravated manner, or the projecting of such force against the

victim by the kidnapper." *Royal*, 234 Kan. at 222. The court further noted that the definition of bodily harm had been narrowed to recognize that some trivial injuries that are likely to result from any forcible kidnapping by the very nature of the act do not constitute bodily harm as that term is used in the aggravated kidnapping statute. Instead, only unnecessary acts of violence upon the victim and those occurring after the initial abduction constitute "bodily harm." 234 Kan. at 222. Thus, minor cuts sustained by a victim during a successful escape effort, a scraped knee of a victim sustained while climbing down a ladder, and nosebleeds, fainting, and stomach distress did not constitute bodily harm.

Considering the facts before it, the court in *Royal* found it significant that the gouge to the victim's collarbone and the cut on her hand were inflicted by the knife used by the defendant in perpetrating the offense. Although these wounds were not life-threatening, the court did not regard them as "trivial" or as likely to result from any forcible kidnapping. Thus, the court held: "Where a knife or firearm is used in the perpetration of a kidnapping, and the victim is wounded by that instrument while the kidnapper is using it to accomplish the crime by force, we hold that the resulting injury constitutes bodily harm as a matter of law." *Royal*, 234 Kan. at 222. The court concluded that the trial court did not err in refusing to instruct on the lesser included offense of kidnapping because defendant was either guilty of aggravated kidnapping or was not guilty.

In the present case, K.T. was touched when defendant manually rubbed her "private," which she identified as "between" her legs, with his finger and with his "private"; was touched when defendant licked her "private"; and was touched when defendant kissed her by inserting his tongue into her mouth. Defendant argues that K.T. never indicated that defendant was violent or rough, or that he hurt her. Thus, because absolutely no physical evidence of any injury was presented, defendant argues that the contact here, when compared with that in other cases considering this issue, falls far short of bodily harm.

The same argument was raised in *State v. Damewood*, 245 Kan. 676, 783 P.2d 1249 (1989), in which the defendant challenged his aggravated kidnapping conviction on both elements of

kidnapping by deception and bodily harm. The victim in *Damewood* was a teenaged boy whom defendant asked to assist him in a beekeeping operation. On two occasions, defendant, on the pretense of working on the beekeeping operation, took the youth into a rural area and forced him to engage in oral sex and other sexual activities. 245 Kan. at 678-79. This court found that the rape and indecent liberties constituted bodily harm for purposes of aggravated kidnapping. Concerning the argument that no evidence was presented that the victim actually suffered bodily harm, we noted:

"While the facts in *Bourne* indicate the child victim had pain and bleeding in her vaginal area, the court's analysis does not mention this as a factor in reaching its conclusion. In *Chears* there is no showing that the victim suffered any physical injury as asserted by the defendant. The long-established rule is that rape or sodomy is sufficient to establish the 'bodily harm' necessary in aggravated kidnapping. Here, [the victim] testified the defendant forced him to participate in various acts of sodomy. The evidence was sufficient to support the conviction of aggravated kidnapping." 245 Kan. at 688.

The State points out that defendant took indecent liberties with K.T. far beyond the initial abduction. Like the injuries suffered by rape and sodomy victims who have no lasting physical scars, defendant's violation of K.T.'s body was a forcible act that the aggravated kidnapping statute was designed to prevent. While K.T. was not physically scarred or injured by the ordeal, she may carry emotional scars for the rest of her life.

The victim's testimony indicated that she was terrified throughout the ordeal. When all the evidence presented in this case is viewed in the light most favorable to the prosecution, it is clear that a rational factfinder could find the defendant guilty of inflicting bodily harm sufficient to meet this element of aggravated kidnapping. K.T. prayed the defendant would let her go. When she had the opportunity, she sat on the floor to discourage him from further encroaching upon her body.

We next consider whether the district court erred in instructing the jury on aggravated kidnapping. At the trial, the State repeatedly asked the court to instruct that, as a matter of law, indecent liberties with a child constituted the element of "bodily harm" necessary to establish aggravated kidnapping. After hearing

the arguments on the issue, the district court granted the State's request and instructed the jury in Instruction No. 2, as follows:

"The defendant is charged with the crime of Aggravated Kidnapping. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant took or confined [K.T.] by force, threat or deception;

"2. That it was done with intent to hold such person to facilitate the commission of indecent liberties with a child or sexual exploitation of a child.

"3. That bodily harm was inflicted upon [K.T.]; and

"4. That this act occurred between the 23rd and 24th day of October, 1989, in Sedgwick County, Kansas.

"*Indecent liberties with a child constitutes 'bodily harm' as used in this instruction.*" (Emphasis added.)

With the exception of the last sentence, this instruction follows the proposed aggravated kidnapping instruction found at PIK Crim. 2d 56.25. The Notes on Use of this PIK instruction state that, if a factual issue exists about whether bodily harm has been sustained by the victim or about the extent of the harm, the instruction on aggravated kidnapping "should include the definition of 'bodily harm.' " (Citing *State v. Royal,* 234 Kan. at 222.) The district court here did not follow the suggestion of the Notes on Use to the aggravated kidnapping instruction by including a definition of bodily harm and letting the jury decide whether the evidence established it. Instead, the court instructed that indecent liberties with ·a child constituted bodily harm, thus taking the question away from the jury.

Defendant asserts that whether bodily harm was sufficiently established was a question of fact for the jury to determine and an element of aggravated kidnapping that the State should have been required to prove beyond a reasonable doubt. Defendant emphasizes that he is not asserting that indecent liberties with a child cannot be the basis for finding that bodily harm occurred to support an aggravated kidnapping charge; instead, defendant is arguing that when indecent liberties with a child is involved, the issue is a question of fact and cannot be taken from the jury and decided as a matter of law.

This court has not held as a matter of law that indecent liberties with a child constitutes bodily harm needed to establish that element for aggravated kidnapping. Although this court has found

that proof of rape and sodomy are sufficient as a matter of law to establish bodily harm, this holding has never explicitly been extended to the offense of indecent liberties with a child. The State urges this court to adopt such a ruling, noting the similarities of rape, sodomy, and indecent liberties. Thus, the State asserts that "[r]egardless of whether the victim suffers actual physical injury, the act of fondling and licking a child's genitalia constitutes bodily harm the same as rape or sodomy."

The State's argument has some merit, but it does not consider the enormous variation in behavior that can constitute indecent liberties with a child. Indecent liberties with a child is defined at K.S.A. 1990 Supp. 21-3503(1) to include any of the following conduct with a child who is under 16 years of age:

"(a) Sexual intercourse; or

"(b) any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both; or

"(c) soliciting the child to engage in any lewd fondling or touching of the person of another with the intent to arouse or satisfy the sexual desires of the child, the offender or another."

Here, the defendant was charged under subsection (b) as follows:

"And between the 23rd day of October, 1989, A.D., and the 24th day of October, 1989, A.D., in the County of Sedgwick, and State of Kansas, one CLAYTON P. PELTIER did then and there unlawfully, willfully, lewdly fondle and touch the person of a child under the age of sixteen (16) years, to-wit: [K.T.], seven (7) years of age, date of birth: November 11, 1981, who was not married to the said [K.T.], with the intent in the said CLAYTON P. PELTIER to arouse or satisfy the sexual desires of the said [K.T.], or the said CLAYTON P. PELTIER or both."

Under the two types of indecent liberties described in subsections (a) and (b), it is obvious that some touching must occur between the victim and the defendant. If this touching is rape or sodomy, under prior Kansas case law these acts constitute bodily harm as a matter of law sufficient to support a conviction of aggravated kidnapping. The degree of touching that would constitute lewd fondling or touching under subsection (b), however, can vary tremendously. Placing a finger anywhere on a child's body could conceivably constitute lewd fondling or touching, but arguably would not be an act of violence as contemplated

by the legislature in imposing the increased punishment of aggravated kidnapping. The State correctly notes that disregarding the sanctity of a child's body may cause humiliation and embarrassment similar to that suffered by victims of rape and sodomy. It is, however, difficult to always equate all acts that can constitute indecent liberties with a child to the violence that will always accompany rape or sodomy.

The problem with the instruction given in this case becomes readily apparent when the third type of conduct constituting indecent liberties with a child is considered. Under this provision, asking a child to engage in conduct that would be considered lewd fondling and touching is indecent liberties with a child even though no touching occurs. To find that such solicitation constitutes bodily harm as a matter of law would go far beyond the requirement of physical touching in the intentional, hostile, and aggravated manner this court has consistently required. Such a conclusion would be contrary to our prior decisions, which required touching to establish bodily harm.

Because of the variety of conduct that can constitute indecent liberties with a child, including solicitation, the district court should not have instructed the jury that, as a matter of law, indecent liberties with a child constitutes bodily injury necessary to establish this element of aggravated kidnapping.

However, having found that the district court erred, the question remains whether this error requires that we reverse the defendant's conviction of aggravated kidnapping. Errors that do not affirmatively cause prejudice to the substantial rights of a complaining party do not require reversal when substantial justice has been done. *State v. Bell*, 239 Kan. 229, 235, 718 P.2d 628 (1986). An error of constitutional magnitude cannot be held to be harmless unless the appellate court can declare beyond a reasonable doubt that the error had little, if any, likelihood of changing the results of the trial. *State v. White*, 246 Kan. 28, 37, 785 P.2d 950 (1990).

Here, the complaint and Instruction No. 5 limited the jury's consideration to whether the defendant committed indecent liberties, as defined under K.S.A. 1990 Supp. 21-3503(1)(b). Instruction No. 5 reads as follows:

"The defendant is charged with the crime of Indecent Liberties with a Child. The defendant pleads not guilty.

"To establish this charge each of the following claims must be proved:

"1. That the defendant fondled or touched the person of [K.T.] in a lewd manner, with intent to arouse or to satisfy the sexual desires of either or both;

"2. That [K.T.] was then a child under the age of 16 years and not married to the defendant; and

"3. That this act occurred between the 23rd and 24th day of October, 1989, in Sedgwick County, Kansas."

The evidence presented at trial did indicate that defendant touched the child in a lewd manner by rubbing her vaginal area with his fingers and licking her "private." To find that Instruction No. 2 is harmless, this court must be able to declare beyond a reasonable doubt that the error in instructing the jury that indecent liberties with a child constituted bodily harm had little, if any, likelihood of changing the results of the trial. In other words, is it possible that if the district court had instructed correctly by defining bodily harm, the jury would have returned a verdict of kidnapping instead of aggravated kidnapping? We think not.

We have repeatedly held:

"Jury instructions are to be considered together and read as a whole, without isolating any one instruction. [Citation omitted.] If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous. [Citation omitted.]" *State v. Morris,* 244 Kan. 22, 23, 765 P.2d 1120 (1988).

Here, defendant used physical force to touch this young victim in an intentional, hostile, and aggravated manner. He rubbed her vaginal area with his fingers and licked it with his tongue. He laid on top of her and his "private" touched hers. He also kissed her by inserting his tongue into her mouth. Instruction No. 5 clearly required the jury to find that defendant committed these acts in order to constitute indecent liberties with a child. The jury did so find by returning a guilty verdict of indecent liberties with a child against the defendant, and we have just determined that these acts are sufficient to support a conviction of aggravated kidnapping. We, therefore, conclude that the er-

roneous instruction did not prejudice the defendant and was harmless beyond a reasonable doubt because the error had little, if any, likelihood of changing the result of the trial.

Finally, the defendant challenges the sufficiency of the evidence to support the verdict of sexual exploitation of a child. As we noted previously, the standard of review on appeal when sufficiency of the evidence is challenged is whether after a review of all of the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Graham*, 247 Kan. 388, 398, 799 P.2d 1003 (1990). The provisions of K.S.A. 1990 Supp. 21-3516 that define the conduct constituting sexual exploitation of a child cover three types of behavior, two of which are relevant here:

"(1) Sexual exploitation of a child is:

"(a) Employing, using, persuading, inducing, enticing or coercing a child under 16 years of age to engage in sexually explicit conduct for the purpose of promoting any performance;

"(b) possessing any film, photograph, negative, slide, book, magazine or other printed or visual medium or any audio tape recording in which a real child under 16 years of age is shown or heard engaging in sexually explicit conduct with intent to arouse or satisfy the sexual desires or appeal to the prurient interest of the offender, the child or another."

Defendant was charged pursuant to K.S.A. 1990 Supp. 21-3516(1)(b) as follows:

"[O]ne CLAYTON P. PELTIER did then and there unlawfully, willfully, possess a negative or film or a photograph in which a real child under sixteen (16) years of age, to-wit: [K.T.], date of birth: November 11, 1981, is shown engaging in sexually explicit conduct, and that such possession was done with the intent to arouse or satisfy the sexual desires or appeal to the purient [sic] interest of the offender, the child or another."

Defendant argues that he is charged "with *possessing* sexually explicit material of a child under subsection (1)(b) and not with *employing* or *using* a child to engage in sexually explicit conduct for the purposes of promotion under subsection (1)(a)."

Defendant's basic argument is that no evidence was presented that he possessed anything that showed a child engaging in sexually explicit conduct. He first argues that the term "film" used in the statute must refer to a moving picture and not undeveloped still photographic film. To support this argument, defendant

points out that the listing of materials includes "film, photograph, negative, slide, book, magazine or other printed or visual medium." According to defendant, the term "film" must refer to something other than the items already listed in the statute that relate to still photography, namely photographs, negatives, and slides. If not, under the statute one could possess motion pictures without violating the explicit terms of the statute.

The fundamental principle of statutory construction requires words in common usage to be given their natural and ordinary meaning in arriving at a proper construction of the statute. *Szoboszlay v. Glessner*, 233 Kan. 475, 478, 664 P.2d 1327 (1983). The legislative intent and purpose behind the reason for enacting the statute controls when the intent can be ascertained from the language of the statute itself. See *State v. Adee*, 241 Kan. 825, 829, 740 P.2d 611 (1987).

One of the meanings of the word "film" is "a thin flexible transparent sheet of cellulose acetate, cellulose nitrate, or other plastic material that is used for taking photographs and that is coated with a light-sensitive emulsion which when exposed and developed contains negative or positive images in black silver or in color." Webster's Third New International Dictionary 850 (1967). Another definition of "film" included in this dictionary is "motion picture." Thus, the natural and ordinary meaning of the term "film" would include motion pictures as well as undeveloped still photographic film of real children engaging in sexually explicit conduct.

Defendant further argues that, even if the word "film" is interpreted to include still photographic film, while in defendant's possession this film was not developed and therefore did not show a child engaging in sexually explicit conduct. Only after the State developed the film into negatives did it for the first time reveal an image of a child engaging in sexually explicit conduct. The State then took these negatives and produced photographs that were distributed for exhibition purposes at trial.

Defendant suggests that the State should have charged him with employing the child to engage in sexually explicit conduct for the purposes of promoting a performance, such as a photograph. According to defendant, because the possession of undeveloped film cannot constitute possession under subsection (b),

the more appropriate charge would have been under subsection (a).

The State counters that this interpretation of the statute is inconsistent with the legislative purpose of prohibiting child pornography. The State argues that the conduct the statute prohibits is not possession of undeveloped film, but use of children to obtain photographs. The fact that the chemical processing steps had not reduced the film to an actual photograph is not conduct that concerned the legislature. Instead, it is the recording of the images initially by using a child to portray sexually explicit conduct that the legislature sought to outlaw. We agree.

We find that the undeveloped photographic film does come within the meaning of "any film" as set out in K.S.A. 1990 Supp. 21-3516(1)(b). The legislature clearly intended to prohibit the conduct that occurred here, and the fact that this film was undeveloped does not prohibit a conviction under 21-3516(1)(b). We conclude that the evidence was sufficient to support the defendant's conviction of possession of sexually explicit material.

The judgment of the district court is affirmed.